May it please the Court, my name is Joseph M. Aliotto. I represent the appellants who are the plaintiffs below. And on the brief with me is Ms. Miller, Mr. Messina, and Mr. Netto. If it please the Court, this is a private action brought under Section 4 and 16 of the Clayton Act. The decision below was on the basis of Rule 12. And therefore, the rule is that all of the allegations should have been given to accept it as true and all the inferences that way. The complaint itself is on page 485 to refer to that. The situation here is I think that it is important to note, as was noted in the complaint, what the particular industry is and what it's gone through. And since 2008, the airlines, major airlines, have been reduced from eight to four by reason of mergers. We are well aware of that.  Okay. In addition, as we have alleged, is that there were very high trade barriers. And therefore, no one could go into the market because they couldn't cover the cost of capital. Therefore, it was basically a closed market with these four major airlines. What the evidence was is that they had, we had two times that we discovered most of it because it was the complaint. But they uniformly, on March of 30, March 30, 2016, and April 1, announced this drastic change in their rules with regard to so-called multi-city. And the result of that was that you were, there were increased prices for those trips anywhere up to as much as 700%. The actual prices was not uniform. That is, each airline did it differently. The results, the outcome, the price result was different. Is that right? In the different areas, that's right. Yeah. But they agreed to the same formula. Yeah. Well, let me make sure I understand what's happening here. In order to get from Phoenix, Arizona, where I live, to New York, I could buy a ticket straight through from Phoenix to New York, or under the old regime, I could buy a ticket to Houston and then another ticket to Atlanta and then a ticket to New York and it would cost me less? Yes, Your Honor. And this action that you're challenging said you can't do that anymore? Correct, Your Honor. And as we alleged, the reason is that in some of those segments, they were competing against their only real competitors, which were the so-called low-cost carriers, and as stated by the American representative, that they didn't want anyone to take advantage of that. And so, basically, the passengers were subsidizing their competition against the low-cost carriers. The evidence is that the first one to make this announcement, and we found out later, so let's start with that, and that is that on March 30th, they had a prearranged meeting at which they … Let's start with that. We only start with that if the court was in error in denying you a right to file a 12-1 indicative motion, because that evidence was not before the court on the original rulings. Is that correct? That's correct, Your Honor, because we didn't know about it. Well, so when you say we start with it, so you are now arguing not that the court was in error in denying your original relief, but you're starting with issue number two, that the court was in error in not allowing you to proceed with this additional evidence. We believe the court was in error in both instances, Your Honor. Well, but the evidence you are now citing doesn't go to your first claim, that the court was in error in denying your original relief. No, Your Honor. The first case, even without the meeting. Okay. Well, I think we understood. Go ahead. Even without the meeting, what the court did was, against all precedent, took each and every separate act and analyzed each act, and finding that in itself it did not state a claim. And so as a result, the court simply ignored the Continental Law decision, which has been a foundational case for many, many years, or in the language of Justice White, where he said that you can't wipe the slate clean after the scrutiny of each. And that's exactly what the judge did in both instances, Your Honor. And so what we have is, forget the meeting at the moment. On March 30th, United comes out with an announcement that it's going to change this drastic, make this drastic change. And it says, and I would direct the Court's attention to, because we quote it, page 9 of our brief, United comes out on its own before American and before United, I mean, and before Delta, and says, quote, multiple U.S. carriers recently made changes to the Cato 10 domestic combinability fair rules. Kennedy. That's consistent with your argument that the carriers made those decisions about a half a month earlier. That's not to say that they made them by agreement or conspiracy a half a month earlier, but simply your own complaint said that those decisions by the airlines to eliminate that multiple-leg pricing was made about two months, two weeks earlier. So a statement that the airlines have done this is simply a matter of historic statement, not a statement of agreement, necessarily. Okay. First of all, Your Honor, that is construing the evidence in the light most favorable to the defendants. Secondly, which is not the case. It's not construing evidence. It's construing your allegations, an allegation in a complaint which we have to accept for motions to dismiss. And it's your own allegation. So there's nothing wrong with reviewing a motion consistent with your own allegations. Your inference that you're drawing, Your Honor, is exactly the opposite of what the allegation was and meant. And what it actually meant was clear, that they had tested, correct, but they never made agreement and nobody was bound by it. And they finally met. Well, I want to bring in that evidence. They finally met on March 30th, the very day they met. And they discussed this. We know what they discussed. The very day they met and discussed this, that's when United announces that now they're changing the rule because multiple U.S. carriers recently decided to do that. And American says one day later, April, two days later, April the 1st, April Fool's Day, American comes out and says recently American Airlines, along with other U.S. carriers. Yeah. Well, Mr. Alioto, you've argued a lot more antitrust cases than I've decided, I think. But we have the law, and to oversimplify, it is that when companies decide to do something and it happens at the same time, that's not good enough to show an agreement or a conspiracy. There has to be more than that. So are you with me? I am, Your Honor. Okay. Now, so here, just in oversimplified terms, the agreement that you have alleged that is beyond the companies all doing this, just deciding they're going to do it, is what? What is the evidence you've pleaded that they got together and said we're all going to do this at the same time? It is very important. They got together for the purpose of changing the rule so that you could not buy segments for multi-city travel. Yeah, but the law is that it's not enough that they just happen to do it at the same time. There's no way that they could just happen to do it because it's a very extensive procedure. And if one of them uses it only, if they don't get the agreement of everyone, if only one of them uses it, then that opens up a fabulous opportunity for anyone else to compete and to increase their market share. But not necessarily, because if the others don't come along, it would be a relatively painless economic position to backtrack. The only way that they could increase these prices as they did, Your Honor, was to make sure that everybody was in on it. They would not be able to do it otherwise. And just to understand, when they made that rule, the rule is with the company ATPCO. That's the company that organizes the rule. They own it. They own it and they sit on the board of directors. And I will say this also. When the whole issue of so-called plus factor was ever, that word ever came about, it was because of this court in CTO Fire Equipment Company. And in that case, one of the executives had a meeting and he denied that he discussed anything at that meeting. And the court, this court, said, nonetheless, that was a plus factor and allowed a conviction, a criminal conviction. In this case, we have not only the meeting. That was lying. Pardon me? That was a case involving lying. Yes. And the fire equipment case, Your Honor. I was struck that Twombly, that we all cite for the need to be specific, actually was an antitrust case. And it specifically said, allegations, bare allegations of conspiracy aren't enough. And so you've got to do more than that. And what the district court case here said, I thought, was applying Twombly and said, look, you've just got to allege facts that you've not done. Actually, the court was relying on summary judgment cases rather than Twombly. But on Twombly, Your Honor, it says, is it feasible? And in that case, there were nothing but conclusory statements that said, okay, there was a combination of conspiracy. We're saying they had a meeting, they had this date on this time, and this is what they said they were going to do. And the next day they did it. But you go back to that meeting, the agenda for that, I don't, that language I actually didn't think was very helpful to you, because that was simply a meeting at the request of another airline, not one of these four that you claim conspired together. And it was simply to admit, to technically try to develop under ATCO a technical way of allowing each airline to express its own rules as to how to apply sector pricing. You are, if it please Your Honor, you are interpreting it in favor of the defendant. No, I was reading the actual language of the agenda. The agenda itself says we have to meet, and then it says we meet, and they did meet. And they discussed it, and the next, not the next day, that day United sent out its  and saying the others were going to do it. And they went, and they made their announcement that next day. And it's specifically about fares, and specifically for this. And it allowed them to increase prices almost immediately. And what was really interesting is that United in its announcement actually draws a diagram where it shows you that you're going to be paying a lot more. In addition, if the travel agents, which we represent, or the passengers, either one, if the travel agents don't go along with it, if the travel agents try to buy, as they used to, segment by segment to get the lowest ticket, if they do that, they are in jeopardy of losing their connection with that airline. And in addition, the airline said it would issue a so-called debt memo, which means you're going to pay the difference. So you might as well go along. As far as the passengers go, any passenger who tried to do it, they announced that they would not necessarily get their bags on time, they would have to pay $200 for changing any change for each one of the segments, and that they wouldn't get connections ordinarily that otherwise would be provided by the same airline. Do you want to reserve? Pardon me? Oh, I do. Yes, Your Honor. Thank you. You may please record. Dan Wall. I represent American Airlines, and I'm speaking on behalf of all of the appellees today. I think the most useful thing I can do for this Court is by beginning with a little more specificity about what the conduct is. Judge Schroeder, I agree with you that the legal principles about when in an antitrust case we can infer conspiracy is what this is really all about. However, counsel's presentation was a little over the map as to what actually happened and what didn't, so I want to address that first. The most specific description of the conduct at issue is found at paragraph 62 of the first admitted complaint, which is at ER 251 and 252. And that refers to an alleged agreement by the airlines to, quote, prevent air travelers from being able to combine the least expensive, nonrefundable one-way fares. I start with that because there's two important things about that. This case started with an allegation that this was about a conspiracy among the airlines. ATP Co. was alleged to have aided and abetted that in some rather mysterious ways, but this began with a preliminary injunction motion in which we had an evidentiary presentation. We had a two-hour argument. And the entire focus of that is on was there evidence of an agreement among airlines to restrict the combinability of these particularly low, nonrefundable one-way fares. And it was in that context that we had the argument about what the travel agent memos mean and whether there were plus factors and whether the airlines had unilateral reasons to do this on their own and so forth. What ensued thereafter was the first amended complaint. It's an interesting posture because the operative complaint comes after the preliminary injunction motion when there has been a bit, it's not discovery literally, but there is a bit of factual exchange and learning about what's gone on. And once again, at that point, the allegation, whether you look at Paragraph 1 or Paragraph 62 that I mentioned earlier, is that it is a conspiracy by airlines not to permit these nonrefundable fares to be combined in this way. Now, that's what Judge Chesney addressed, and Judge Chesney very faithfully followed Twombly and this Court's decision in musical instruments, which are applying the pleading standard in the particular context of an antitrust conspiracy claim, where for decades prior to Twombly, because this was all originally developed in the context of summary judgment decisions, the Supreme Court had laid down this fundamental antitrust policy about not allowing certain inferences of conspiracy from parallel conduct unless there was some strong suggestion of conspiracy. And this Court in the musical instruments case goes into great detail on the economic foundations of that and why we put plaintiffs through a somewhat challenging path in order to create the proper inference. At that time, Judge Chesney decides that the complaint hasn't adequately been pleaded, and she grants the motion to dismiss. Now then, after the notice of appeal has already been filed, the plaintiffs say that they find this information about these various meetings that have been going on at ATP Co., and mind you, they found it on the Web, and they try to spin that as the smoking gun evidence of a conspiracy now to change so-called structure. What they're now saying are APT Co. rules, not an agreement among the airlines, but APT Co. rules in some way. But what rule? Is there any evidence in the motion for an indicative ruling or even any allegation that an ATP Co. rule is what is causing the airlines to restrict combinability? CAT-10 is simply part of a taxonomy that ATP Co. uses for how carriers file their own rules about all sorts of different things that affect the airfares that you and I buy. And the airlines had filed their own amended CAT-10 rules that were the issue here, not anything that ATP Co. did. And as Jesse, well, as you noted, the one can read the evidence that is put in support of the motion for indicative ruling. That's not out of bounds. It's not violating Rule 8 or Rule 12. And it was, in fact, plaintiff's demise that Judge Chesney read that evidence, because what one sees throughout that is a process, a continuous process. It's not something that just happens in the middle of March of 2016. It's something that has been ongoing for years. It's ongoing now. It will go on into the future of constantly evolving the ATP Co. system so that airlines have more tools and more ways to establish their own fares and fare restrictions. In fact, the agenda says that we want this meeting in order to specify and maintain combination restrictions for each carrier's fares. Right. And once you see this. And I believe, at least it was characterized by the district court, that it goes on to say that this is for the purpose of automated data rather than hard code, which changes would allow carriers to control fare combinations based on their individual business needs. Precisely. So it was a technical meeting to say, business carriers, you can decide what you want to do about these destination fares, but we're going to have a technical meeting, whatever your plans individually are, how you can express them. Right. And the reason this happens is because the carriers have got to use this computer system to fashion their fares so that they can be efficiently distributed to the global distribution systems and the travel agents and everyone that writes our tickets. And so there's a continuous process that is probably most evident in the two documents that are in the excerpts of record, page 69 and 149, which are these large product services alignment agendas, which are pages and pages and pages of proposals of a similar kind of can you build the functionality to do this, can you build the functionality to do that, because I, an airline, and not just one of these three airlines, this is started by Aegean Airlines, of all things, that wants to be able to make time-sensitive restrictions of combinability of fares starting in Athens. And so they make the request, and then ATP Co. has a technical discussion and makes technical changes to things like user interfaces and coding protocols. And then the airlines do whatever they want. And I think what's significant here is if, as Judge Chesney does, one looks at the documents, you see projects about permitting functionality for time-sensitive combinability restrictions, this broad project of alignment with IATA, this functionality so that you could distinguish between what we call open jaws and circle trips for computer logic, but which you don't see ever is any indication of any normative discussion of what a rule should be. In particular, no discussion of restricting the combinability of a particular class of low-cost fares. There's nothing in any of this that has anything to do with that. The only evidence or allegation that they had of that was they took these after-the-fact travel agent memos, and they tried to liken them in some way to essentially the admission of coordinated action that Judge Alsup had before him in this B&R Supermarkets versus Visa case, where somebody with a CEO of Visa came out and said, yeah, we all got in a room and worked it out. Well, that's not what was said here. What they said is that we've made changes in response to changes that other airlines made, and that is the classic pattern of follow-the-leader behavior that one sees in all of these conscious parallelism cases, many of which, ironically, like Judge Posner's decision in text messaging, cite the airline industry as the, in this instance, literal textbook example of an industry in which you can't make anything of that pattern because it is common and to be expected in the industry structure. Well, in fact, the Ninth Circuit in musical instruments isn't the law here in our circuit that conscious parallelism in an oligarchy sector is not an antitrust violation. Precisely, and this is, Judge Bork once wrote this famous book called The Antitrust Paradox, and the antitrust paradox was that perfect competition looks like perfect cartel behavior in its outcome. You can get, you can look at the outcome and not be able to tell what the cause can be. Oh, yes, but look, the classic situation of driving through Silicon Valley and all of the gas stations have the same price because one guy comes out and says, I'm lowering it, and so the other people do, and it all happens at the same time. It doesn't mean that they all got together in a meeting and said, we're going to change the price. Right. Okay, but here you have something a little bit more than just, aha, we're going to change this price for this particular route. You have a rather complex, as I understand it, decision that has a few moving parts. It's not just you can no longer buy these kinds of tickets. But at least that's the argument. Yes, it is. You disagree with that. Absolutely, and this is an attempt. Everybody tries to plead their case within the line in the Twombly decision about complex and historically unprecedented changes that have no apparent purpose other than to coordinate industry behavior, and so too here. But first of all, there's nothing complex about this. All the airlines did in sequence was to say that as to those low-cost fares, which create the greatest disparity between the airline's chosen fare from Phoenix to New York and this potential combination fare that arises by operation of these rules, that we're going to eliminate those from our combinability possibilities. There's still lots of combinable fares. There's tons of combinable fares, all refundable fares, fares that don't involve these particular low-cost fares. So it was three similar companies that were facing the same issue, that the interaction between their decision to compete aggressively with low-cost carriers and their combinability rules were creating these crazy dislocations between their intended fare for a particular route They all at the same time decided we're going to get rid of these low-cost, the ability to take advantage of these low-cost fares. We're going to keep all the other kinds of combinations possible, and we're going to have the same kind of baggage regulations and all of that, and what you do with your check bags and all that. So what had happened and what is alleged in the complaint, which incorporates the United statement that they made to their travel agents, is that this had already occurred in Europe. This had already occurred on international flights, where the low-cost carrier issue had arisen earlier in time, and then when it happened here, the allegation is that the airlines did it here as well. Now, under the law, under the court's jurisprudence, one can say, all right, I can believe that that is possible to reconcile with conspiracy, but that gets you nowhere because what you have to do is go down that series of steps that we see in a case like musical instruments, where we look for the plus factors that take it out of the possibility of conspiracy to those things that make us reasonably believe that this is not consistent with unilateral follow-the-leader dynamics. And their biggest argument below was the after-the-fact travel agent memos, which proved nothing because that's simply reporting on a common experience, and the later argument, based upon the ATP co-evidence under the motion for an indicative of ruling, just falls apart by reading the documents. So you still are left in a position where you don't have that something more. You simply have, you know, plausibility is not just a buzzword here. In the antitrust cases involving collusion claims, it means that the allegations have survived the conscious parallelism analysis dictated by Twombly and musical instruments. That is exactly what Judge Chesney applied faithfully. She did it first in a preliminary injunction motion, then in two rounds of motions to dismiss, and then effectively again with the motion for indicative ruling, and she consistently came to the conclusion that they hadn't gotten over the line. Thank you, Your Honor. Roberts. Thank you, counsel. One moment. Mr. Allio, go ahead. I was checking with our courtroom deputy. She was ready. I would like to set one thing straight, and that is that they said that this meeting was on their website, easily available. They brought that up to Judge Chesney. Judge Chesney ruled on page 3 of the transcript in her order that it was persuasive that the plaintiffs could not find it, and the reason was it wasn't readily available. And it also says, given the absence of any link on the ATPOC website. And when we had the preliminary injunction, of course, nobody said anything about the meeting. So we didn't know about it then, and we discovered it totally by accident. When you call it a meeting, it was people weren't in a room together. These were just many, many people, not just these three airlines, but a large number of people on a website. Is that correct? On the telephone. Is that what you mean, Your Honor? Well, electronically. I mean, they were meeting on the telephone. Yeah. They were meeting on the – It wasn't an in-person meeting. They weren't in person. They were on the telephone. But many people were involved in this. The three companies are the only ones that raised the issue. And by the way, if I might say, that price-fixing is okay on the international market. That's what they're talking about. And so when they say we just wanted to do what they're doing internationally, that's illegal, and they can't do it. So, I mean, that's their statement. What is the judgment here? We're talking about Rule 12. We're asking whether or not, if these facts are true, that they had the meetings, they agreed on this, they knew it was a price issue, they knew it was a fair issue, council just admitted it, and they went ahead and did it anyway, and they did it in combination at the same time, for sure, so that nobody could back out. In 30 seconds, because your time is up, how do you distinguish musical – the majority opinion in musical instruments? Well, I believe that in that case they were saying that if there's a balance, if there's a balance. But here there's no balance. It's just one way. They're only doing one thing. They're increasing the rates, and they're doing it together. And if they don't do it together, it won't work. And council admitted that the basic thrust of it – I got another 56 seconds somehow. No, you're over time. Was that extra? You're over time. Oh, I was over. Wrap it up. May it please your honors. Thank you very much. I appreciate it. Thank you to both council for their excellent and impassioned argument today. This matter is submitted.
judges: Ebel, Schroeder, Owens